1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

UNITED STATES OF AMERICA,          :
                                   :
   v.                              :
                                   :     CASE NUMBER CR-4:23-00035-1
GREGORY SMILEY,                    :
                                   :
       Defendant.                  :
_____

MOTIONS HEARING

BEFORE THE HONORABLE CHRISTOPHER L. RAY
United States Magistrate Judge

United States Courthouse
8 Southern Oaks Court
Savannah, Georgia
June 30, 2023

TRANSCRIBED BY:  Victoria L. Root, CCR
                 United States Court Reporter
                 Post Office Box 312
                 Meldrim, Georgia  31318
                 (912) 650-4066

Proceedings recorded by FTR.  Transcript subsequently produced
by mechanical stenography and computer-aided transcription.

2

A P P E A R A N C E S

FOR THE GOVERNMENT:

    MARCELA C. MATEO, Esquire
    Assistant United States Attorney
    22 Barnard Street, Suite 300
    Savannah, Georgia  31401
    (912) 201-2552
    marcela.mateo@usdoj.gov


FOR THE DEFENDANT:

    GREGORY N. CRAWFORD, Esquire
    1509 Abercorn Street
    Savannah, Georgia  31401
    (912) 238-3999
    crawfordlaw@comcast.net

3

I N D E X

                                                    Page

PRELIMINARIES. . . . . . . . . . . . . . . . . . .     5


GOVERNMENT'S WITNESSES:

    1. WARREN WEIR
        Direct Examination by Ms. Mateo . . . . . . .    11
        Cross-Examination by Mr. Crawford . . . . . .    36
        Redirect Examination by Ms. Mateo . . . . . .    46
        Recross-Examination by Mr. Crawford . . . . .    48


GOVERNMENT'S PROFFER . . . . . . . . . . . . . . . .    50


DEFENDANT'S EVIDENCE . . . . . . . . . . . . . . . .    53


CLOSING ARGUMENTS
    By Ms. Mateo . . . . . . . . . . . . . . . . . .    54
    By Mr. Crawford. . . . . . . . . . . . . . . . .    62
    By Ms. Mateo . . . . . . . . . . . . . . . . . .    68


COURT'S RULING . . . . . . . . . . . . . . . . . . .    70


CERTIFICATE OF REPORTER. . . . . . . . . . . . . . .    81

4

E X H I B I T   I N D E X

| GOVERNMENT'S EXHIBIT NUMBER | IDENTIFIED | TENDERED | ADMITTED |
|---|---|---|---|
| 1 | 20 | 20 | 21 |
| 2 | 22 | 22 | 22 |
| 3 | 28 | 28 | 29 |
| 4 | 30 | 29 | 29 |
| 5 | 31 | 30 | 30 |
| 6A | 31 | 31 | 32 |
| 6B | 32 | 32 | 32 |
| 7 | 34 | 34 | 34 |

5

P R O C E E D I N G S

(Call to order at 9:55 a.m.)

THE COURT:  Good morning, everyone.

MR. CRAWFORD:  Good morning, sir.

MS. MATEO:  Good morning, Your Honor.

THE COURT:  Ms. Davenport, if you would, please call the case.

COURT CLERK:  4:23-CR-135-1 [sic], *United States of America v. Gregory Smiley*.

MS. MATEO:  Good morning, Your Honor.  Marcela Mateo on behalf of the Government, and we're ready to proceed this morning.

THE COURT:  Thank you.

MR. CRAWFORD:  Greg Crawford for Mr. Smiley, Your Honor.  We're ready.

THE COURT:  All right.  Thank you.

Good morning, Ms. Mateo; good morning, Mr. Crawford; and good morning, Mr. Smiley.

THE DEFENDANT:  Good morning, sir.

THE COURT:  I will note for the record that Mr. Smiley was previously ordered detained by the Court back on April the 28th of 2023 with an order that was entered at Docket Entry Number 116.  That order expressly made clear that, although the defendant was being remanded to custody at that time, it was with the express preservation of his right to

6

still petition for bond at a later date and time pursuant to Title 18 of the United States Code, Section 3142.

In fact, on June the 28th at Docket Entry Number 179, Defendant, in fact, did file such a motion for bond to be granted in this case, and, thus, the Court has now set that matter down for hearing today on the issue of release versus detention. The Government had stated its intention previously that it would seek detention in connection with this case.

I note, in reviewing Count 1 of the indictment, that it does charge a conspiracy charge in violation of the Controlled Substances Act and -- which would impose a maximum term of imprisonment of 10 years or more.

Ms. Mateo, that would make this, then, a rebuttable presumption case, would it not?

MS. MATEO: That's correct, Your Honor.

THE COURT: All right. Very well.

So let's just review -- thank you. Let's just review the standard and the procedure for today in light of that.

Because the particular charge Mr. Smiley is facing in this case gives rise to a rebuttable presumption pursuant to Title 18 of the United States Code, Section 3142(e)(3)(A) that he should be detained with respect to this particular charge, the defendant, therefore, has an initial burden of production in this case in which he must come forward with sufficient evidence to at least overcome the presumption that he ought be

7

detained based simply upon the charge -- the charged offense.

If Mr. Smiley is able to meet that comparatively low burden, then the burden of proof in the case would shift back to the Government, and the Government would be heard on its primary burden in this case, which is to demonstrate, either or both, to a clear and convincing evidence standard that there is no condition or combination of conditions in this case which would reasonably assure the safety of the community if Mr. Smiley were to be released or to a preponderance of the evidence standard that there is no condition or combination of conditions which would reasonably assure that Mr. Smiley would appear if he were to be released.

So against that backdrop and that test, Mr. Crawford, you have the initial burden of production here with respect to overcoming the presumption, and so I will hear from the Defense.

MR. CRAWFORD:  Your Honor --

MS. MATEO:  Your Honor, I would just like to say before he starts we do intend to call a witness, the Government does, and that witness is present in the courtroom.  I just make that aware -- if there's any objection from Defense during his argument that he step out, I just wanted to make the Court aware that he is present in the courtroom, and we would like him to stay if granted.

THE COURT:  Who is the witness?

8

MS. MATEO: Yes. It's Agent Warren Weir.

THE COURT: Okay. Mr. Crawford, your view?

MR. CRAWFORD: Your Honor, I had intended -- and I received the pretrial services report just a little while ago -- to meet my burden by referring the Court to this report wherein my client was indicted in the Western District of New York in 2007. It was a conspiracy to distribute counterfeit sneakers -- Reeboks, Nikes -- initiated by security personnel from those companies. They protect their brands.

Mr. Smiley and about 28 other defendants were indicted as street-level dealers from around the country in conjunction with several middlemen and a couple of Chinese nationals who were actually bringing the counterfeit goods in through the Port of New York.

He made every appearance in that case. And that is now before the Court in the form of the pretrial services report. The first time, he had to appear for arraignment. He drove and had to drive back to Buffalo. And after that, I believe he flew. I think there were a total of four appearances over the course of 5 and a half years. He made every one.

The Government -- or Pretrial Services has deemed him a risk of danger and a risk of nonappearance. There's nothing in the pretrial services report to support that. In fact, there's everything in the pretrial services report to support a

9

grant of bond.

I'm hoping I can meet my burden without putting my client on the stand. His wife has been indicted. That is normally who I would call. I can't do that. I can't contact her without Ms. Copeland's permission.

THE COURT: Well, let me pause at just this point. Obviously, the burden of production at this stage is a fairly low one. Mr. Crawford comes forward with a proffer in which he represents to the Court that the defendant has a serial history of appearance by virtue of his participation in a prior prosecution in another United States district court, and he asks the Court to accept that that is essentially a sign of reliable and good citizenship, which would be sufficient to rebut the presumption that he ought be detained.

I agree with that representation; and, therefore, I will conclude that the defendant has met his low burden at this point of rebutting the presumption that he ought be detained. The burden now shifts back to the United States in its case in chief.

Mr. Crawford, you may be seated.

MR. CRAWFORD: Thank you.

THE COURT: Ms. Mateo, I'll hear from the Government if you have any witnesses or evidence.

MS. MATEO: Yes, Your Honor. I would like to first start with a witness, and then I will proffer something as to

10

the pretrial services report, if that is okay with the Court.

THE COURT:  That is fine.  Please call your witness.

MS. MATEO:  The Government calls Agent Warren Weir.

THE COURT:  Agent Weir, if you would please come forward.  I'd ask you to come up to the witness stand.  And just before you sit there, I'll ask you to turn, face the clerk, raise your right hand, and she will administer you an oath.

(The witness, Warren Weir, was sworn.)

COURT CLERK:  If you would, have a seat, please.  State your name and spell your last name for the record.

THE WITNESS:  It's Warren Weir.  Last name is W-e-i-r.

THE COURT:  And if you'd make that microphone right up to your mouth, please.

THE WITNESS:  (Complied.)

THE COURT:  Thank you.

MS. MATEO:  Your Honor, may I approach?

THE COURT:  Please.  And you may proceed.

MS. MATEO:  Thank you, Your Honor.

(No omissions)

WARREN WEIR,

having been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. MATEO:

Q.    Agent Weir, who is your employer?

A.    Savannah Police Department.

Q.    And how long have you been with the Savannah Police Department?

A.    9 years.

Q.    And are you assigned to any group other than the Savannah Police Department?

A.    I'm currently assigned to Chatham-Savannah Narcotics Team.

Q.    And is that commonly referred to as CNT?

A.    CNT.

Q.    And how long have you been with CNT?

A.    Almost 6 years.

Q.    And can you please describe what CNT is.

A.    It's a -- we strictly focus on narcotics in Chatham County.

Q.    And prior to Savannah Police Department, did you have any other law enforcement experience?

A.    Yes.  I worked for a sheriff's department in South Carolina for 2 years.

Q.    And over the course of your law enforcement career, approximately how many drug investigations have you been

12

involved in?

A.   A couple hundred.  At least 200.

Q.   And as an agent with CNT, did CNT work with the Drug Enforcement Administration and initiate an investigation on Gregory Smiley?

A.   Yes.

Q.   when did that occur?

A.   2022.  The first part of 2022.

Q.   And are you the case agent on that investigation?

A.   Yes, ma'am.

Q.   And have you reviewed the evidence in this case?

A.   Yes, ma'am.

Q.   And you've read some of the reports, not all of them; is that fair to say?

A.   Yes, ma'am.

Q.   And today, you'll be testifying on the reports you've read, maybe conversations with other law enforcement, and some personal knowledge; is that fair?

A.   Yes, ma'am.

Q.   Directing you back to 2022, how did the investigation start for CNT?

A.   We received a narcotics complaint on James Burton.  From there, we started an initial investigation that led to a T-III wiretap, state wiretap.

Q.   And how did your attention then turn to Gregory Smiley?

13

A.   We intercepted several phone calls of Mr. Smiley and Mr. Burton, and then we were able to surveil -- through those phone calls, we were able to see narcotics -- Mr. Smiley supplying Burton with narcotics.

Q.   And prior to that date, 2022, has Gregory Smiley come up on any other investigations by law enforcement?

A.   Yes.

Q.   Multiple times?

A.   In multiple --

MR. CRAWFORD:  I'm going to object, Your Honor.  This is irrelevant to the proceeding before the Court, the fact that his name had come up in other cases.  That is far short of any evidence that would enable the Court to make a determination in this case -- in this matter.

THE COURT:  Ms. Mateo.

MS. MATEO:  Your Honor, I believe it goes to not only the weight of the evidence, but, also, it goes to the history and characteristics of the defendant, which are two factors that the Government will argue for when the Court considers and also what the statute entails the Court to look at.

THE COURT:  Objection is overruled.

BY MS. MATEO:

Q.   Now, based on the investigation, how long ago did Gregory Smiley begin in drug trafficking?

A.   We can go back as far as 2017.

14

Q.   And how would you describe his role in the organization?

A.   In this current investigation, he was a source of supply for this organization and appeared to operate in a leadership role.

Q.   And did he have a relationship with any of the members -- other members in this organization?

A.   I know he's married to one of his codefendants, Lena Smiley.  He was arrested with a female, Ebony Coleman.  He traveled to Las Vegas several times.  Wilbert Gordon is perhaps his brother-in-law.  He has a long-term friendship or -- with some of the other defendants, James Burton.

Q.   And given these relationships and this leadership role that you state he has, does Gregory Smiley have control over the others in the drug trafficking organization?

A.   He was -- they would -- yes.

Q.   And can you give an example of that.

A.   He would -- people sometimes had to wait on him -- wait for him to be ready to meet them.  He would direct them where to go.  Sometimes he would redirect them to another location, when to meet, where to go.

Q.   And what kind of drugs were associated with this drug trafficking organization?

A.   It was cocaine, crack cocaine, marijuana, and we have some pills that were determined to be meth.

Q.   And what was his volume when it came specifically to some

15

of these narcotics?

A.    We know that -- kilos of cocaine.  We had pounds of marijuana.

Q.    And kilos of cocaine over a span of weeks? months?  How often?

A.    Well, based off our statements and other factors, we believe it to be 6 to 12 kilos a month.

Q.    And how you -- you mentioned that you've been involved in over 200 drug investigations.

      How would you describe Gregory Smiley's method of distribution compared to perhaps other investigations you've been involved in?

A.    The communication were sophisticated.  After multiple wiretaps being involved with, his communications and methods were a little more sophisticated than some of the other investigations.

Q.    And is this due to the type of language they used?

A.    He was coded when he spoke on the phone, even locations where he was going to meet at.  He might refer to one word, and some of his codefendants would have to understand what that meant and go meet him there.  And sometimes the same word might mean a different location.

Q.    And you stated that there was surveillance of him meeting up with codefendants, but was there other ways that narcotics were distributed in this case, other methods?

16

A.    Well, we know we -- they were distributed through parcels, packages being delivered to here, yes.

Q.    And you stated that he was a leader, he directed others, told people where to meet.

Did he also use others to shield himself?

A.    Yes.

Q.    Can you give an example of that.

A.    10 Concordia, which was one of his main stash houses, it was being rented by another person, Tywanna Lewis, where we was able to determine that he would give her cash and she would pay for the rent.

Q.    And during the course of your investigation, was Gregory Smiley ever found with any firearms?

A.    No.

Q.    Were others associated with him, though, found with firearms?

A.    During the search warrants, yes.

Q.    And over the course of the investigation, did he use multiple cell phones?

A.    Yes.

Q.    And in your training and experience, Agent Weir, why would a target use multiple phones?

A.    One, they can compartmentalize the people they talk with. And it was also a way to shield law enforcement from tracking certain communications.

17

Q.   And in drug trafficking organizations, is it common to use a stash house?

A.   Yes.

Q.   Was that used in this investigation?

A.   Yes, ma'am.

Q.   And were there multiple stash houses?

A.   Yes, ma'am.

Q.   Over the course of the investigation, you stated there was distribution.

Was there any evidence of manufacturing?

A.   Yes, ma'am.

Q.   Please explain.

A.   When we did the search warrants on December 21, we found cooking utensils at 10 Concordia to -- used to make powder cocaine into crack cocaine.  Then we also did a search warrant on West Henry Street.  At that point, there was a -- manufactured crack cocaine at that location that looked substantially the same to some of the cooking utensils or cooking plate that was found at Concordia.

Q.   And, also, was there any evidence found of repackaging marijuana, for example?

A.   Yes.  There were bags at 10 Concordia.  We had a large amount of marijuana found there.  And we found that there -- other bags that could be broken down from the bigger bags to the smaller ones.

18

Q.    I'd like to shift at this moment.  You've just testified as to a brief overview of the drug portion of the investigation.  Let's talk briefly about Gregory Smiley's finances.

Can you explain -- over the course of the investigation, what was, if any, his financial activity?

A.    He used multiple financial institutions where he was able to move money around, which was indicative of money laundering.

Q.    And you said "multiple financial institutions."

Does this include casinos?

A.    Yes.

Q.    And how much are we talking about when we talk about the casinos?

A.    Between 2021 and 2022, approximately $1.1 million.

Q.    During your investigation, did law enforcement subpoena and obtain flight records?

A.    Yes.

Q.    And did you have an opportunity to review those?

A.    Yes.

Q.    And when Gregory Smiley would travel, did he purchase the tickets?

A.    Yes.

Q.    How would he purchase them?

A.    He used several different credit cards.

Q.    And how far in advance would he purchase these tickets?

19

A.    Many of the times, they were 1 to 3 days out.  There --
I think one time, it was -- we was able to determine it was a
longer planned trip.  But most of the times, it was 1 to
3 days.

Q.    And how often was he traveling?

A.    Almost every week.

Q.    Did he have a job during that time that would require
traveling, or why --

A.    The only --

Q.    -- was he traveling?

A.    -- job that I'm aware of is at the ILA, and it -- I don't
think that required traveling.

Q.    So why was he traveling, based on the investigation?

A.    To visit different casinos.

Q.    And as part of this financial investigation, were, also,
bank records subpoenaed?

A.    Yes.

Q.    And were those reviewed?

A.    Yes, ma'am.

Q.    As well as bank records, were records subpoenaed from
Robinhood?

A.    Yes.

Q.    What is Robinhood?

A.    It's basically a financial marketplace.

Q.    And did Gregory Smiley have an account with Robinhood?

20

A.    Yes.

Q.    And those records that were obtained from Robinhood, did you or someone from law enforcement have an opportunity to review them?

A.    Yes, ma'am.

Q.    I'd like to direct your attention -- there's a binder in front of you --

A.    Uh-huh.

Q.    -- Agent Weir, that contains some exhibits.

        MS. MATEO:  And the Court should have a binder as well as Defense Counsel.

BY MS. MATEO:

Q.    If you could please turn to Exhibit 1, Tab 1.

A.    (Complied.)

Q.    Do you recognize that document?

A.    Yes.

Q.    And is that a -- other than the redactions, is that a copy of some of the Robinhood statements obtained by subpoena?

A.    Yes, ma'am.

Q.    And is that an exact copy other than that redaction of personal information?

A.    Yes, ma'am.

        MS. MATEO:  Your Honor, at this time, the Government would like to move in Exhibit 1.

        THE COURT:  Mr. Crawford, any objection?

21

MR. CRAWFORD:  No objection, Your Honor.

THE COURT:  Government's Exhibit Number 1 is admitted without objection.

BY MS. MATEO:

Q.   And, Agent Weir, in looking at that, what year statement is that from from Robinhood?

A.   This is 2021.

Q.   And who does it belong to?

A.   Gregory Smiley.

Q.   And what is your understanding of the amount of -- first of all, what is the amount of money that is shown -- that is being moved according to that statement?

A.   The proceeds show 1,535,000, and then the cost basis is 1,603,000.

Q.   And in your understanding, is that just from trades moving back and forth, and that's how much not in the balance but just movement of money?

A.   Yes, just the movement of money.

Q.   And what is that indicative of, in your training and experience, as it relates to that amount of finances?

A.   Appears to be a way to hide money, launder money.

Q.   Now, did, also, law enforcement subpoena tax returns for Mr. Smiley?

A.   Yes, ma'am.

Q.   And did they receive tax records as it relates to

22

Mr. Smiley?

A.    Yes, ma'am.

Q.    And did you have an opportunity to review specifically 2019?

A.    Yes, ma'am.

Q.    Directing your attention, then, to Tab 2 in the binder, do you recognize that document that is Government's Exhibit 2?

A.    Yes.

Q.    And those are tax forms from 2019?

A.    Yes, ma'am.

Q.    Other than the redactions made, is that a true and accurate copy -- or is that an exact copy of the return from 2019 --

A.    Yes, ma'am.

Q.    -- via subpoenas?

A.    Yes, ma'am.

Q.    And it's multiple pages; is that correct?

A.    Yes.

        MS. MATEO:  At this time, the Government would like to move into evidence Exhibit 2.

        THE COURT:  Mr. Crawford, any objection?

        MR. CRAWFORD:  No objection, Your Honor.

        THE COURT:  Government's Exhibit Number 2 is admitted without objection.

                        (No omissions)

23

BY MS. MATEO:

Q.   And it's a 2019 return; is that correct?

A.   Correct.

Q.   Who is it for?

A.   It is for Gregory Smiley and Lena Smiley.

Q.   And what was the reported income based on those documents?

A.   The joint income was $38,606.

Q.   And in your review of the records returned from the Georgia Department of Revenue, did Mr. Smiley file taxes in 2020 --

A.   No.

Q.   -- personal taxes?  I apologize.

2021?

A.   No, ma'am.

Q.   And is it fair to say that there are no records known for 2022 or 2023 returned by . . .

A.   We have not obtained any of those records.

Q.   Now, I want to direct your attention to the arrest of Gregory Smiley on December 21st of 2022 now.

Where was he located when he was arrested?

A.   At the Atlanta airport.

Q.   And who was he with?

A.   He was with a female named Ebony Coleman.

Q.   And where was he coming from?

A.   They were coming from Las Vegas.

24

Q.   And what was he doing in Las Vegas, based on the investigation?

A.   He was at a casino.

Q.   And did he have any bags with him at that time when he was arrested?

A.   He had a book bag, yes, ma'am.

Q.   Was that seized and searched by law enforcement?

A.   Yes.

Q.   And what, if anything, was found inside of it?

A.   A little over $10,000, a little bit of jewelry, and some other personal hygiene items.

Q.   And did Mr. Smiley have a cell phone or multiple cell phones on him?

A.   Yes.  He had multiple cell phones.

Q.   And during that interaction, would you describe Mr. Smiley as cooperative with law enforcement?

A.   No, ma'am.

Q.   Why would you say that?

A.   Well, based off jail calls, he had already been alerted, when the plane landed in Atlanta, that law enforcement were at some of his locations.  I think maybe it was -- possibly his daughter called him.  So he was slow to get off the plane. Law enforcement was waiting for him.  Ms. Coleman had already exited the plane.  He tried to walk past law enforcement.  They approached him, and he was -- wouldn't provide his name or an

25

I.D.

Q.    And did they try to locate Ms. Coleman?

A.    Yes.

Q.    And was he any assistance to that?

A.    No, ma'am.

Q.    You testified that there was a state wire on James Burton. At some point, was a federal wire obtained in this investigation?

A.    Yes.

Q.    And who was the target of that wire?

A.    Gregory Smiley.

Q.    And so was Gregory Smiley not only intercepted on the state wire, but, obviously, was his calls recorded on the federal wire?

A.    Yes, ma'am.

Q.    And I think you've testified a little bit of other methods of investigation. You mentioned surveillance; is that correct?

A.    Yes.

Q.    And subpoenas?

A.    Yes.

Q.    Were there also controlled purchases done over the course of the investigation?

A.    Yes, several of his other codefendants.  We were able to complete several.

26

Q.    And when you say "codefendants," what did the investigation reveal as to his role or association with those codefendants?

A.    That he was supplying those other codefendants.

Q.    And were -- you testified briefly, but there was search warrants done in this case; correct?

A.    Yes.

Q.    So let's direct your attention now to December 21st, 2022. That was the same day of his arrest?

A.    Yes.

Q.    And were multiple federal search warrants also executed that day?

A.    Yes.

Q.    And overall from those search warrants, was cocaine seized?

A.    Yes.

Q.    Crack cocaine?

A.    Crack cocaine, yes.

Q.    Pills that were meth?

A.    Yes.

Q.    Bulk cash?

A.    Yes.

Q.    Firearms?

A.    Yes.

Q.    Marijuana?

27

A.    Yes.

Q.    And any high-end jewelry?

A.    Yes, ma'am.

Q.    Let's direct your attention, though -- I want to talk specifically about 10 Concordia Drive.

What association, if any, does Gregory Smiley have with that residence?

A.    We've surveilled him going there many times.  He would leave -- when he flew back into town, one of the first places he went back to was 10 Concordia.

Q.    And what, if anything, was seized from that location?

A.    Approximately between 1 and a quarter, 1 and a half kilos of cocaine, approximately 90 pounds of marijuana.  We had bulk cash.  We found several different identifications, some of them not -- some of them were fake identifications at 10 Concordia -- also the high-end jewelry.

Q.    And when you say "bulk cash," we're talking about over $150,000 --

A.    Yes.

Q.    -- in U.S. currency?

A.    Yes.

Q.    Were you at the location that day?

A.    No, ma'am.

Q.    However, have you reviewed the reports and the pictures associated with that search?

28

A.    Yes.

Q.    In addition to the items you just listed and also in the other search warrants, what volume of electronic devices were also found?

A.    We found multiple cell phones.  Don't know the exact amount, but there was multiple.

Q.    And although Gregory Smiley is based here in Savannah, were -- does he have contacts in other states?

A.    Yes, ma'am.

Q.    You mentioned some items that were seized and some that were found.

      If you would, please, turn in the binder to Exhibit 3.

A.    (Complied.)

Q.    And Government's Exhibit 3, is that a photograph of items found -- one item found at 10 Concordia Drive?

A.    Yes, ma'am.

Q.    And is that a true and accurate depiction of that item on December 21st, 2022?

A.    Yes.

Q.    And just for the record, it's a photograph of currency; is that correct?

A.    Correct.

          MS. MATEO:  Your Honor, at this time, the Government moves Exhibit 3 into evidence.

          THE COURT:  Mr. Crawford, any objection?

MR. CRAWFORD:  No objection, Your Honor.

THE COURT:  Government's Exhibit Number 3 is admitted without objection.

BY MS. MATEO:

Q.   And, Agent Weir, looking at Exhibit 3, can you just describe to the Court what we're looking at in that photograph.

A.   It's an orange bag with a bulk sum of U.S. currency in there.

Q.   And it was found during that search warrant on that date?

A.   Yes, at 10 Concordia.

Q.   And now looking at Exhibit 4, is that also a photograph?

A.   Yes, ma'am.

Q.   Was that taken at 10 Concordia Drive --

A.   Yes.

Q.   -- on that same date?

A.   Yes, ma'am.

Q.   And is that a true and accurate depiction of the item being photographed on that day?

A.   Yes.

MS. MATEO:  Your Honor, the Government moves Exhibit 4 into evidence at this time.

THE COURT:  Mr. Crawford, any objection?

MR. CRAWFORD:  No objection, Your Honor.

THE COURT:  Government's Exhibit Number 4 is admitted without objection.

30

BY MS. MATEO:

Q.   And can you describe what we're looking at in the photograph, Agent Weir.

A.   These are several boxes that were containing multiple pounds of marijuana.

Q.   And now looking at Government's Exhibit 6 -- excuse me -- 5, is that a photograph as well?

A.   Yes, ma'am.

Q.   That was not taken at the search warrant location; correct?

A.   No.   This is at CNT.

Q.   And this is because the items in the photograph were then seized by law enforcement?

A.   Yes.

Q.   And is that a true and accurate depiction of the items depicted in that photograph?

A.   Yes, ma'am.

        MS. MATEO:  Your Honor, the Government moves Exhibit 5 into evidence at this time.

        THE COURT:  Mr. Crawford, any objection?

        MR. CRAWFORD:  No objection, Your Honor.

        THE COURT:  Government's Exhibit Number 5 is admitted without objection.

BY MS. MATEO:

Q.   And can you please describe to the Court what we're

viewing in that photograph.

A.   Those are individual bags, approximately 1 pound of -- I think, apiece.  It's individual bags of marijuana.

Q.   And that was all seized from 10 Concordia Drive; correct?

A.   Yes, ma'am.

Q.   You mentioned that, at that location, there were fake identifications; is that correct?

A.   Correct.

Q.   Was that seized by law enforcement?

A.   No, ma'am.

Q.   And so that was just left at the location?

A.   It was left at the location they were found at.

Q.   And was a photograph taken of those IDs?

A.   Yes.

Q.   I'd like to direct your attention to 6A -- Government's Exhibit 6A.

     Is that a true and accurate depiction of the photo -- excuse me -- of the IDs that were found at 10 Concordia Drive other than the redactions made?

A.   Yes, ma'am.

     MS. MATEO:  And, Your Honor, at this time, the Government would like to move Government's Exhibit 6 into evidence -- 6A into evidence.

     THE COURT:  Mr. Crawford, any objection?

     MR. CRAWFORD:  No objection, Your Honor.

THE COURT:  Government's Exhibit Number 6A, the redacted version of four driver's licenses, is admitted without objection.

MS. MATEO:  And for the record, Your Honor, you'll see that there's a Government's Exhibit 6B, and we would ask that it also be admitted.  It is not redacted; however, I think, as to the testimony and what we're trying to show, it is relevant.  So we would like it to be admitted; however, we would ask it please be sealed as it does contain personal identifying information of Mr. Smiley.  However, we believe the redacted version does not show what we will ask in a few questions of Agent Weir.

THE COURT:  Mr. Crawford, any objection to admitting the unredacted version of the driver's licenses but keeping them under seal?

MR. CRAWFORD:  No objection.  Thank you.

THE COURT:  All right.  All right.  Then Government's Exhibit 6B, the unredacted version of the four driver's licenses depicted in this paragraph, is admitted without objection.  The Court will consider both 6A and 6B as part of the record of this hearing.

MS. MATEO:  Thank you, Your Honor.

BY MS. MATEO:

Q.   Agent Weir, if you'll please turn to 6B, which I think is under Tab 7 -- I apologize for the binder -- can you please

33

describe to the Court whose picture is in all four of those IDs.

A.    Mr. Gregory Smiley.

Q.    Is his name depicted in those IDs?

A.    It is on two of -- two of the IDs, his name is on there.

Q.    And what name -- is it another name in other IDs?

A.    Yes.  In the -- the other two remaining IDs is Brian Gadson (phonetic).

Q.    And how about the birth dates?  Are they the same?

A.    No.  It's separate birth dates -- different birth dates.

Q.    And how about the addresses?

A.    There are different addresses.

Q.    And so when you testified that they were fake, is that because that information does not belong to Mr. Smiley?

A.    Correct.

Q.    And what, if anything, does that indicate to law enforcement, to find multiple fake identifications like that?

A.    It's an attempt to suppress or hide your identification.

Q.    Now, I'd like to turn to Exhibit 7, which is under the tab of 8.  I apologize.

      Was a passport found at 10 Concordia Drive?

A.    Yes, ma'am.

Q.    And who did it belong to?

A.    Mr. Smiley.

Q.    And were photographs taken of that passport?

34

A.    Yes, ma'am.

Q.    But was it seized by law enforcement that day?

A.    No, ma'am.

Q.    So it remained at the residence?

A.    Yeah.  It was left at the residence.

Q.    Now, was a photograph taken of inside the passport during that search?

A.    Yes.

Q.    And looking at Government's Exhibit 7, is that a true and accurate depiction of the passport as it was seen on December 21st, 2022?

A.    Yes, ma'am.

        MS. MATEO:  Your Honor, at this time, the Government would like to move into evidence Exhibit -- Government's Exhibit 7.

        THE COURT:  Mr. Crawford, any objection?

        MR. CRAWFORD:  No objection, Your Honor.

        THE COURT:  Government's Exhibit Number 7 is admitted without objection.

BY MS. MATEO:

Q.    And can you please describe to the Court -- what are we viewing in Government's Exhibit 7?

A.    This passport is -- he has a Brazilian visa for the country of Brazil.

Q.    And you -- when you say "he," you are talking about --

35

A.    Mr. Smiley.

Q.    -- Mr. Smiley?

        MS. MATEO:  Your Honor, one moment, please.

        (Pause in the proceedings.)

BY MS. MATEO:

Q.    Agent Weir, I believe you testified that high-end jewelry was found over the course of the execution of the search warrants; correct?

A.    Yes, ma'am.

Q.    And that was from a different location than 10 Concordia Drive, or do you remember?

A.    I think it was at the -- where his wife stayed.  I forget the address, but yes.

Q.    And so I think you had testified before that there was high-end jewelry found at Concordia Drive.

        Is that, in fact -- it was found at a different location?

A.    Yes.

Q.    And one question as well.  Were there items not -- during the search, obviously, law enforcement searches these locations.

        Did law enforcement come to find out that they may have missed certain items?

A.    Yes, ma'am.

Q.    And how was that information obtained?

A.    Through jail calls.

Q.   And can you just please describe just briefly just -- did it involve Mr. Smiley?

A.   Yes.

Q.   And just stating that items were missed during the search?

A.   Yes.  It was -- appeared to be coded language, yes, but it was interpreted as we had missed some items.

Q.   And was he directing someone to go obtain those items?

A.   Yes, ma'am, his wife, Lena Smiley.

MS. MATEO:  One moment.

Your Honor, the Government has no more questions for this witness.

THE COURT:  All right.  Thank you, Ms. Mateo.

Mr. Crawford, your witness on cross.

MR. CRAWFORD:  Thank you.

CROSS-EXAMINATION

BY MR. CRAWFORD:

Q.   What items did Mr. Smiley instruct Lena Smiley to go get?

A.   He had called her from the jail call and told her -- asked her about a Bible.  And he specifically -- and she said she had the Bible, that it was good.  And he asked her was it good, good, and she re- -- said no.  She said it wasn't good, good, good, but it was good, good.  And that appeared to be a coded language for something was in the Bible.

Q.   Coded language for what?

A.   For money.

37

Q.   You think it was money?

A.   Yes, sir.

Q.   Do you have evidence to support that conclusion?

A.   No, sir.

Q.   That's just what you think --

A.   Yes, sir.

Q.   -- "Bible" meant?

A.   Yes, sir.

Q.   Now, the visa that you referenced, when did Mr. Smiley go to Brazil?

A.   I don't have that in front of me.  I can look at the --

Q.   You had it in front of you because somebody took a photograph.

A.   Yes, sir.

Q.   What's the year of the visa, Agent Weir?

A.   Appears to be possibly 2017.

Q.   Did you make any efforts to corroborate that?

A.   No, I did not.

Q.   Did you find out if he actually took a trip?

A.   I did not.

Q.   Is it your contention here today that he flew to Brazil in 2017 or otherwise traveled there to avoid prosecution for some offense?

A.   No, sir.

Q.   There is nothing inherently illegal about owning either a

38

passport or having a visa, is there?

A.    No, sir.

Q.    Do you know what he did in Brazil?

A.    No, I do not know.

Q.    You're not alleging that he committed any crime either in traveling to Brazil or while he was there, are you?

A.    Never alleged it.

Q.    Now, you testified that this organization -- or this criminal activity goes back to at least 2017; is that right?

A.    Well, we -- the question was did we know of his activities being involved in narcotics, and I said it went back, as far as we know, to 2017.

THE COURT:  Mr. Crawford, let me interrupt you.

If you would just move the microphone up to your mouth, please.

THE WITNESS:  Oh, I'm sorry.

Keep it there?

THE COURT:  Please.

THE WITNESS:  Yes, sir.

BY MR. CRAWFORD:

Q.    And yet every act in the indictment has a crime commit date of 2022, doesn't it?

A.    Yes, sir.

Q.    And you testified in front of a Chatham County grand jury against Mr. Smiley as well; correct?

39

A.   Yes.

Q.   And obtained a true bill of indictment in Superior Court of Chatham County, Georgia; correct?

A.   Yes, sir.

Q.   And every crime alleged in that indictment has an offense date of 2022; correct?

A.   Correct.

Q.   Now, the Robinhood statement, is this a complete record -- is it a complete record by itself, or is it a page out of a larger record?

A.   There's several -- multiple pages from what I understand.

Q.   Okay.  And this page was selected to bring to court and introduced into evidence?

A.   I think that's the face page, the front page.

Q.   And it shows 1.535 million.  And then next to that, the cost basis, 1.603 million; correct?

A.   Correct.

Q.   Which shows a net loss of $32,000?

A.   Correct.

Q.   Now, what was the average daily balance of that account?

A.   I don't have that in front of me.

Q.   Do you have it anywhere?

A.   It would be in the evidence.

Q.   But you're not -- at the time the accounts were seized and the Robinhood account forfeited, $82,000 was in the account;

40

right?

A.    I -- I don't recall.

Q.    There was never $1.5 million in the account, though --

A.    No.

Q.    -- was there?

A.    It shows the money that was flowing through the account. It doesn't show a balance.

Q.    This is day trading, isn't it, Agent Weir?

A.    Perhaps, yes.

Q.    These are aggregates, aren't they?

A.    Could be, yes.

Q.    Could be?  You know, as you sit here, that he never had $1.5 million in that account, don't you?

A.    I know that, yes.

Q.    Do you know the most he ever had in that account at one time?

A.    No.

Q.    Do you know if, in all the time he's had that account -- well, he doesn't have it anymore -- he ever made a single withdrawal?

A.    I do not know that.  I don't have that in front of me.

Q.    Okay.  So he's bought and sold, bought and sold, bought and sold; right?

A.    Correct.

Q.    And that's what these numbers represent; correct?

41

A.    Correct.

Q.    The same money being used again and again --

A.    Correct.

Q.    -- right?

So what is the purpose in waving around the $1.5 million in court when he never had $1.5 million?

A.    Because it's indicative of money laundering, of trading to hide money, to move money.

Q.    Day trading stocks in a brokerage account is indicative of money laundering?

A.    In this instance, yes.

Q.    Okay.  What were the gross deposits into that account for 2022, Agent Weir?

A.    I don't have that in front of me.

Q.    Do you have it somewhere?

A.    It would -- in our evidence, yes.

Q.    Gross deposits were under $25,000, weren't they?

A.    I still don't have that in front of me, sir.

Q.    You contend that losing $30,000 in a brokerage account is indicative of money laundering?

A.    The movement of the money, yes.

Q.    The movement of the money.

That's buying and selling stocks, isn't it?

A.    Yes.

Q.    And he's not indicted for doing anything with this

42

Robinhood account, is he?

A.   It's part of the investigation, but it's not in --

Q.   He's not --

A.   To answer your question, no, he's not.

Q.   Okay.  There's no crime that the Government has alleged associated with this Robinhood account, is there?

A.   No, sir.

Q.   Now, you indicated 2019 is the last year that you could find the tax returns for Mr. Smiley?

A.   Yes, sir.

Q.   And you indicated you had nothing for 2022, nothing for 2023?

A.   This current year, yes.

Q.   Okay.  Wait.  You understand that he's been incarcerated since December 2022 --

A.   Yes.

Q.   -- right?

     We wouldn't expect him to have any paperwork for 2023, would we?

A.   Correct.

Q.   Now, Mr. Smiley was arrested at the Atlanta airport?

A.   Yes, sir.

Q.   And -- coming back from where?

A.   Las Vegas.

Q.   How long had he been there?

43

A.   I don't have that in front of me.

Q.   When was the last time that Greg Smiley had been at 10 Concordia Drive in Savannah prior to his arrest at the Atlanta airport last December?

A.   I don't have that in front of me.

Q.   Who had entered and exited 10 Concordia Drive since the last time Mr. Smiley had visited that location, the names and sex, if possible, of every person who entered and exited 10 Concordia after his last visit to the location?

A.   I've never seen anyone enter and exit but Mr. Smiley and Lena Smiley.

Q.   It wasn't surveilled, was it?

A.   No.

Q.   Okay.  So when you say you've never seen anybody, the location wasn't surveilled 24-7 or anything even approximating that, was it?

A.   Correct.

Q.   Okay.  You don't know who was there because you didn't surveil it and look to see who was coming and going; right?

A.   Yes, sir.

Q.   And you don't know who brought the marijuana into 10 Concordia Drive, do you?

A.   No.

Q.   You don't know who had been, what appeared to be, cooking cocaine with those utensils that you described earlier, do you?

44

A.    No, sir.

Q.    You don't know when they were used, do you?

A.    No, sir.

Q.    You don't know how long they had been sitting there, do you?

A.    No, sir.

Q.    Mr. Smiley's DNA is not on those utensils, is it?

A.    We haven't tested his DNA, sir.

Q.    You don't have any evidence that Greg Smiley cooked cocaine at 10 Concordia Drive or anywhere else, do you?

A.    No, sir.

Q.    Now, the marijuana that was found, that was at 10 Concordia?

A.    Yes.

Q.    How many search warrants were executed that day?  Five?

A.    Nine.

Q.    Nine?

A.    I think it was nine, sir.

Q.    And cocaine was found in one location?

A.    No.  It was found in several locations.

Q.    It wasn't found at Mr. Smiley's residence, was it?

A.    It was found at two of his residences.

Q.    How much cocaine was found at Greg Smiley's residence on Chevy Chase?

A.    None.

45

Q.   How much was found at his residence in Hinesville?

A.   We didn't search Hinesville, sir.

Q.   Now, these IDs that you presented, you don't have any evidence that Greg Smiley has ever used one of these IDs in the commission of a crime, do you?

A.   I do not have evidence of that.

Q.   Didn't know that they existed until they were discovered while -- in the premises and photographs were taken; right?

A.   Yeah.  That was the first time we went in his house, so yes.  We didn't know they existed till that day.

Q.   Could be indicative of criminal activity?  Is that why you took the pictures?

A.   Yes.

Q.   Could be indicative of somebody doing something that they don't want their spouse to find out about?  Could also be that; right?

A.   Yes.

Q.   But, again, no evidence that these were ever used in any crime; correct?

A.   I don't have any evidence they were ever used in a crime.

Q.   No firearms found on Mr. Smiley?

A.   Not on Mr. Smiley, no, sir.

Q.   No firearms found at his home?

A.   No, sir.

Q.   No allegations of violence against Greg Smiley anywhere in

46

either the federal or the state indictment, are there?

A.   One more time, sir.

Q.   There are no allegations of violence by Greg Smiley against anyone in either the federal or the state indictments; correct?

A.   No, sir.

Q.   When's the last time Greg Smiley was convicted of a felony?

A.   I don't have his criminal history in front of me.

Q.   You ran it at some point, didn't you?

A.   I, like, reviewed it.  I don't -- I didn't necessarily -- was the one who ran it.

Q.   You've reviewed it?

A.   Yes, sir.

Q.   Is that what you're -- you don't recall when he was last convicted of a felony?

A.   No, sir.

        MR. CRAWFORD:  Your Honor, I don't have any other questions at this time.

        THE COURT:  All right.  Thank you, Mr. Crawford.

        Ms. Mateo, any redirect?

        MS. MATEO:  Very briefly, Your Honor.  Thank you.

                    REDIRECT EXAMINATION

BY MS. MATEO:

Q.   Agent Weir, there were some questions about that Bible.

     During the course of the investigation, the searches, were

47

there any items found associated with Mr. Smiley that contained hidden compartments?  Are you aware of . . .

A.    Not off the top of my head, no, ma'am.

Q.    And there were some questions about the Robinhood account and if it was charged with anything.

Gregory Smiley was charged with a conspiracy to money launder; is that correct?

A.    Yes, ma'am.

Q.    And so such movement of money, whether it be in the casino or the Robinhood account, is --

A.    Yeah.

Q.    -- part of that evidence and part of that charge; is that correct?

A.    Yes, ma'am.

Q.    There were some questions about 10 Concordia Drive and the last time Mr. Smiley was there.

The IDs were found there; correct?

A.    Yes.

Q.    And his passport was found there?

A.    Yes.

Q.    And, at some point, was Tywanna Lewis interviewed regarding that residence?

A.    Yes.

Q.    And who did she say she rented it for?

A.    Gregory Smiley.

48

Q.   There was a question -- I think it was a broad question -- about violence and Mr. Smiley.

Are you aware of any investigations or any allegations of threats made by Mr. Smiley?

A.   Not off -- not off the top of my head, no, ma'am.

Q.   Are you aware that he recently was moved from Chatham County Jail to another facility?

A.   Yes.

MS. MATEO:   I have no more questions for this witness.

THE COURT:   Thank you, Ms. Mateo.

Mr. Crawford, any recross?  If you would, questions from the podium, please.

RECROSS-EXAMINATION

BY MR. CRAWFORD:

Q.   Do you know why Mr. Smiley was moved?

A.   I -- I do not know.  I know the -- I do not know, sir.

Q.   Do -- did you understand that he recently posted a $2,500 bond on state charges and that he was relocated as a federal prisoner?

A.   I was not made aware of that.

MR. CRAWFORD:   May I ask -- there was one question I forgot to ask on my initial cross.

BY MR. CRAWFORD:

Q.   What do you consider to be high-end jewelry?

49

A.    I guess it's up to the opinion -- over $100,000 would be high-end to me.

Q.    One piece?

A.    No.  Multiple pieces.

Q.    Okay.  So you could have a number of pieces that aggregated 100,000, but none of them might have any value that would be considered high-end?  That's possible based on --

A.    There was one piece that -- and I don't have every piece in front of me, but $30,000 would be a -- high-end to me, yes.

Q.    $30,000 what?

A.    A pendant.  A pendant that went on a necklace.

Q.    Gold?

A.    It was gold, maybe some diamonds in it.

Q.    Where did you get the $30,000 figure from?

A.    It was taken to a professional jeweler.

Q.    After seizure?

A.    Yes, sir.

Q.    Do you know how much he paid for it?

A.    He didn't tell me.  No, sir.

Q.    Do you know what the price of gold was when Mr. Smiley purchased that pendant, if he, in fact, purchased it?

A.    I don't know when -- I know the price of gold, but I don't know when he purchased it, so I don't know.

          MR. CRAWFORD:  Thank you.

          THE COURT:  Thank you, Mr. Crawford.

50

Ms. Mateo, anything else?

MS. MATEO:  Nothing from this witness, but the Government would like to proffer a few points into evidence.

THE COURT:  Well, let me -- let me excuse the witness --

MS. MATEO:  Yes.

THE COURT:  -- and then we'll proceed to that.

Agent Weir, that concludes your testimony before the Court.  You may step down.

Let me ask:  Does anyone have Agent Weir under subpoena today?

MS. MATEO:  No, Your Honor.

MR. CRAWFORD:  No.

THE COURT:  All right.  Very well.  You may resume your seat in the gallery.  You're also free to leave.

THE WITNESS:  Yes, sir.

THE COURT:  Leave that on -- just leave that on the witness stand, if you would.

MS. MATEO:  Your Honor, may I approach?

THE COURT:  You may, Ms. Mateo.  And I'll hear your proffer.

MS. MATEO:  Your Honor, this is two areas that the Government would like to proffer before making its argument for detention.

The first is that the Court has the presentence

report for Mr. Smiley.  That's at Document [sic] 88.  The Government recently found out that, as it relates on Page 4 to that United States District Court, District of New York --

THE COURT:  Bear with me one moment, Ms. Mateo.  Let me open that and take a look.

MS. MATEO:  Yes, Your Honor.

THE COURT:  All right.  I have it up.  Please proceed.

MS. MATEO:  Yes, Your Honor.

The United States Probation Office informed both myself and Defense Counsel this morning that, during pretrial release for that charge, Mr. Smiley did have two petitions filed against him.  One was in 2009 that related to that arrest that you see right under that.  It's for a possession of marijuana.  So there was a petition filed for a new arrest while he was on bond.

Also, in 2011, Mr. Smiley had a positive drug screen for marijuana that did result in a petition.  That is all the information that the probation office did give myself and Mr. Crawford; however, I did want to bring that to the Court's attention and proffer that.

THE COURT:  To be clear, though, no evidence that his pretrial release was ever revoked as a result of those violations; is that correct?

MS. MATEO:  That's correct.

52

THE COURT:  All right.  Very well.

MS. MATEO:  Also, Your Honor, I will just proffer to the Court that movement from Mr. Smiley, the Government will proffer, was a result of the request of the Government. While it's not corroborated -- and so we understand what weight the Court will give it -- there was information that Mr. Smiley threatened an individual, and thus the Government did move and request to move Mr. Smiley from Chatham County.  Again, that's still under investigation, and it is very new.

However, I think it's important given -- and the Government did not ask for that information on direct. However, given the question made by Mr. Crawford as to the violence, it felt that the door was open and wanted to proffer that into evidence but understanding the weight the Court can put into it given it's not corroborated at this time, Your Honor.

THE COURT:  Thank you, Ms. Mateo.

Does that conclude your proffer?

MS. MATEO:  Yes, it does.

THE COURT:  Does the Government have any additional witnesses or evidence that it wishes to present?

MS. MATEO:  No, Your Honor.

THE COURT:  All right.  Thank you, Ms. Mateo.

Mr. Crawford, does the Defense have any witnesses or evidence that you would like to present?

53

MR. CRAWFORD:  I would like to --

THE COURT:  Mr. Crawford, if you'd come to the podium, please.

MR. CRAWFORD:  I'd like to mark this notice of seizure as Defendant's Number 1 from the Department of Justice dated -- well, my client's wife dated it 2/21 -- that shows the $82,263.29 that was seized from the Robinhood account.

THE COURT:  If you do wish to mark it, please take it over to Ms. Davenport.

MR. CRAWFORD:  Unless the Government will stipulate that that is the amount.  If the Government will stipulate that was the amount seized from the account at the time of Mr. Smiley's arrest, then we wouldn't need to tender it.

THE COURT:  Ms. --

MS. MATEO:  Your Honor, the Government will stipulate solely because this is not redacted.  And so entering it into evidence, the Government has concerns.  It does have his address on it.  So we'll stipulate that, yes, that seizure amount was for that amount.

THE COURT:  And let's -- let's have that number read in as to the stipulation.

The dollar amount, Mr. Crawford, is?

MR. CRAWFORD:  $82,263.29.

THE COURT:  Ms. Mateo, the Government stipulates that that was the amount of the seizure?

54

MS. MATEO:  Yes, Your Honor.

THE COURT:  All right.  Very well.

Any additional evidence or witnesses, Mr. Crawford?

MR. CRAWFORD:  No, Your Honor.  Thank you.

THE COURT:  Very well.

Ms. Mateo, I will hear argument from the Government first, please.

MS. MATEO:  Yes, Your Honor.  May I approach?

THE COURT:  Please.

MS. MATEO:  Your Honor, the Government moves for detention and believes it is the only remedy in this case. There are no conditions that would not only protect the community from Mr. Smiley, but, also, we are arguing that he is also a flight risk.  We believe that he's a flight risk and a danger to the community and the factors weigh in favor of detention.

Going through the factors, specifically the nature and circumstances of the charged offense, as the testimony was heard today, this is a drug trafficking organization where the investigation shows Mr. Smiley, beginning in 2017, with multi-kilo amount of drugs, different types of drugs being distributed into the Southern District of Georgia, serious drugs.  This is a drug trafficking organization that has members of his family, those that he's associated with, and, as the testimony showed today, those that he is a leader --

55

who he can direct and who he has control over.

The circumstances of the charged offense do relate to, again, a mandatory minimum of 10 years as it's the amount of drugs that were moved as part of that conspiracy that Mr. Smiley was a leader of.  We believe that that shows not only -- and weighs in favor of detention due to the safety of the community, but, also, it shows flight risk for what he is being charged with and also what he faces should he get convicted.

As we go to the weight of the evidence against the defendant, Your Honor, the testimony here today was there was a Title III, both state and federal -- he was intercepted. It was recorded -- physical surveillance of him resupplying codefendants; controlled purchases for those he supplied that were recorded; electronic surveillance showing him going to different locations that were part of the organization, stash houses; interviews; statements of other individuals saying that, "Yes, I was renting for Mr. Smiley"; statements from cooperators stating his role as a leader, his role as an organizer of this drug trafficking organization.  The weight of the evidence -- it is a strong case as to the drugs.

As to the money laundering, records -- financial records, his trips to Vegas, the money movement, conversations he had, as the testimony here was today, of him directing to move -- to move items that were not seized by law enforcement.

The evidence is overwhelming in this case.

Now, we go into the history and characteristics of the defendant.  There was some argument by Defense Counsel that he has a serial history of appearances, that he went to Buffalo, he appeared.  And it cuts both ways.  That was in 2007.  He was charged, and he did appear.  But also during that time, he had two petitions filed against him for not following the rules.

And the Government would argue that circumstances have most definitely changed.  Since 2017, he is a leader of a drug trafficking organization with power, with funds, with a passport, with IDs.  And even if you take away those passports, the fake IDs are indicative -- he's able to get fake identification to thwart law enforcement.  He is able and has the means.

I believe and the Government submits that, as we have the testimony, this was a sophisticated organization, sophisticated because he spoke in coded language.  He is aware of law enforcement, and he is aware and has done things to make sure that his language is coded.  There's limited talk.  He has these fake identifications.  He has this control.  He shields himself, as the testimony was here today, by telling people where to meet but also putting assets in other people's names.

And in addition to that distribution, we had testimony there was manufacturing as well.  And as we continue

57

on and hear that testimony changing from the drug investigation to the finances, I understand Mr. Crawford's argument that he does not have $1.5 million sitting in an account somewhere. The Government submits, obviously, that shows the money laundering. He's laundering the money through the casinos, through that account. But he did have $163,000 in bulk cash at Concordia Drive. He had over $10,000 in cash on him when he was arrested.

And his behavior while arrested, that shows how powerful he is in this organization. He already knew they were there waiting to arrest him, and he already knew what was going on back in Savannah when he was in Atlanta flying. He got a phone call. And he was the last one off the plane. Didn't want to give I.D. and didn't want to help law enforcement.

And, of course, he doesn't have to, but it just shows how fast he gets information, how he directs individuals, and how, if you release him on bond, that control will be there even more so. Many of these individuals are out on bond. He -- obviously, there is some testimony of jail calls. But he's directing them while he's in jail. Imagine the influence if he's out. That is where the safety of the community and that is where, really, the argument -- where the danger comes in.

And the money -- the access to the money, the identifications, the ability -- I understand the argument about

the visa, that it -- you know, he could have gone to Brazil on vacation, sure. But it shows he is able to get a visa. He's able to have a passport. Even if you take those away, I don't think it eliminates the danger of him obtaining another one -- he has the funds and the means -- or obtaining a fake one, as we've seen with identification.

Also, the testimony today talks about that he does -- even though his ties are here and he's lived in Savannah, he has contacts in other states. His travel patterns, Your Honor, 1 or 2 days ahead -- I think the testimony was 1 to 3 days in advance -- he would buy a ticket, different credit cards, traveling sometimes with his wife, sometimes with his girlfriend, going to different casinos, sporadic but always a few days in advance. I believe that shows the means that he has and the ability.

His finan- --

THE COURT: Ms. Mateo, let me ask you a question.

MS. MATEO: Yes, Your Honor.

THE COURT: Tell me why the use of an ankle monitor or the use of some order that he remain in his home or the status that he would be in on release, presumably deprived of a passport, deprived of access to funds, why that constellation of tools, which I'm sure is what Mr. Crawford's going to be up here asking me about -- why that constellation of tools would not be adequate to give the Court the reasonable assurance that

59

I have to have in order to permit release.

MS. MATEO:  Yes, Your Honor.  The Government would argue that it's the financial resources and his ability to get fake identification.  But, also, even the ankle monitoring, he was at home when he was laundering money.  He was at home when he had access to all of these accounts.  He was at home with his wife and other codefendants that are released on bond.

It is the act of -- even with home confinement or an ankle monitor, he's very much in the environment where he committed all these crimes before, and it wouldn't be sufficient because the Government and law enforcement was -- excuse me -- were surveilling him before, and it shows his movements and his ability to direct others.

At least inside a jail where at least there is some protections there, the safety of the community -- that is why it weighs in favor of detention, because he would have the ability, even at home, to be a danger to the community.

And when it comes to flight risk, even with a curfew or home detention, the reality is -- is that he's shown that he has the financial resources.  What would stop him from cutting that ankle monitor and going and leaving and being gone, obtaining another passport?

THE COURT:  How do I square that with a guy who traveled to Buffalo four times during a pending federal indictment, which I suspect his exposure to potential penalty

60

may have been less in that matter?  But what's the Government's view as to what weight I should give that evidence?

MS. MATEO:  I think it shows, yes, that -- and the Government doesn't dispute that he went there, but I think as -- how I framed my argument, circumstances have changed. It's not 2007 with a counterfeit to traffic counter- -- excuse me -- a conspiracy to traffic counterfeit goods.  This is a large drug trafficking organization with multiple defendants that he has control over.  It is after two petitions were filed while he was on pretrial release for a new arrest and for a positive of marijuana, so showing that he doesn't follow those rules.

Even looking -- and I know it's old, but the 2005 -- in the pretrial services report, a probation violation.  He's had opportunities to follow the rules, and he hasn't.  And I believe that his past conduct and also the little employment that he has with the financial resources shows how great of a drug trafficker Mr. Smiley has been.

I think, also, it puts the Government in a position -- again, since there are codefendants and there has been talk about him directing them, is -- puts him in another place of power.  And that goes straight into the danger of the community and his ability to continue going.

Your Honor, I believe that if the Court reviews the factors and the testimony here today -- again, I understand

that it is a proffer from the Government on why we moved him, but I think that also shows a part, that there was a threat made, and believe that those perhaps interested in cooperating or those with information against Mr. Smiley have a fear of him.

And I believe it's important because the history -- again, we understand that the criminal history is not as, perhaps, egregious as the Court has seen, but I think it's important.  We have that probation violation.  There is a distribution of marijuana, an arrest for that.  There is, again, those -- new conduct while he was on pretrial release from a federal court.  He has back, I believe -- and I understand it's old, but willful obstruction of law enforcement and a sale of marijuana.  I think it shows how long he's been doing this.

Also, although it was amended -- but going back to 1999, possession of a firearm by a convicted felon.  And, again, the testimony -- and the Government does not dispute that he was not found with any firearms and they were not found in his residence, but codefendants -- there were firearms found as a conspiracy as a whole.

And, again, the Government believes that detention is necessary in this case.  And, again -- one moment, please.  The testimony here shows, again, his financial resources.  The tax records show not an income that he's reporting.  And these

62

trips show his ability to travel.  The bulk cash, the fake IDs, the amount of drugs seized in this case, these all weigh in favor of detention, Your Honor.  Again, it is indicative of the type of individual Mr. Smiley is and the resources he has not to appear and also to be a danger to this community.

Thank you, Your Honor.

THE COURT:  All right.  Thank you, Ms. Mateo.

Mr. Crawford, I'll hear from the Defense, please.

MR. CRAWFORD:  Your Honor, if you look at the pretrial services report -- now, I've known Mr. Smiley for many years.  He even -- as a teenager, he was in a car.  They were headed to Atlanta, four individuals.  I represented a codefendant in that case.  They were all arrested in Treutlen County, a small amount of marijuana and a firearm.  He was acquitted.

He even -- at the age of 18, we had to make multiple trips to Treutlen County before that case was tried and resolved, many trips.  He has always appeared.  He's never failed to appear at any point.  He doesn't have a felony conviction in 24 years.

The Government keeps talking about his resources, but they waited to present this to a federal grand jury until they had orders of forfeiture for everything they had seized.  Now, they bring in Exhibit Number 1, which shows $1.5 million in this Robinhood account.  That is -- there was never --

THE COURT: In fairness, what that is is a tax statement from Robinhood at the end of the year.

MR. CRAWFORD: Yes, sir. Yes, sir. But he never -- I mean, at the time of arrest, there was $82,000 in that account. That -- those numbers show day trading aggregates. He never had that kind of money in the account. There was no reason to bring that in and introduce it into evidence.

THE COURT: Let's talk about that for a minute, Mr. Crawford, though. The way in which you want the Court to look at that evidence -- and you used the example of he takes the same $25,000 -- he puts it in. He takes it out. He puts it in. He takes it out.

And you want the Court to think of it as the same pot of money -- right? -- the same small amount that gets put in?

MR. CRAWFORD: That is my understanding, yes, sir.

THE COURT: But just in looking at an end-of-year tax form, it would look exactly the same if he put one group of 25,000 in the first day, a different 25,000 in the third day, yet a different 25,000 in the fifth day. You -- the money is fungible. The Court doesn't have any way of knowing whether it's the same cash or different cash.

It only knows that 1.5 million traveled through the account at the end of the year; true?

MR. CRAWFORD: Yes, sir. I think that's exactly correct.

64

THE COURT:  All right.

MR. CRAWFORD:  But -- so I asked the agent, since he's the one that authenticated the document, "Well, this is part of the document; correct?" and asked him what was the average daily -- had no idea.  Weren't able to present that.  So I've got the 82,000, what was in there when they seized it.

They talked about threats.  There's no allegations of violence against Greg Smiley at any time, never have been.  That's just never happened.  And when I point out -- they want to present him as a danger, and I point out that there are no allegations of violence or of firearms in any of his -- well, then we get this, "Well, there was a threat made at the jail.  We're investigating a threat made by Mr. Smiley."  To who?  Don't know.  And then she stood here and referred to the threat -- is what I thought I heard her argue a moment ago -- as if it is a settled, established fact, which I don't believe it is, and I don't believe it will be.

You know, the -- he's not a man of violence.  There are no allegations of violence that -- they have painted him, through opinion, as a world leader in drug trafficking.  He did go to Brazil once.  No evidence that that has anything to do with any criminal activity.  They don't have any substantive act alleged other than in 2022.  So the idea that he's been doing this for years but it -- there's no evidence of it.  There won't be any evidence of it in this case.

Given the fact that he was born and raised here -- he has been living in Hinesville primarily for about 20 years, got a house through a government program. These homes had been built, I think, during the first Gulf War and used -- were made available through a special program to returning soldiers. And at some point around the early 2000s, they shifted gears, and those homes were made available for private sale.

And he bought a home down in Liberty County for his family at a reasonable price. It's appreciated. It's probably -- I recall him paying somewhere around $50,000 for it. I think it's probably worth 130- now. But this is his home.

He has four kids, and he's been the sole source of support for them. They -- the youngest is now, I believe, 16 because I remember Mr. Smiley talking about how much the car insurance for four kids was costing, and he was hoping to get one of them out of the house.

There's no reason, given his history -- I mean, he's going to be -- if he's ever before the Court for sentencing, it looks to me he's going to be a Criminal History Category 1 or 2. Since he was a teenager, he's led a -- his criminal history is negligible, traffic offenses. He did have a marijuana arrest while he was on bond. We knew who that marijuana belonged to. That marijuana was ultimately attributed to someone else, and the charge against Mr. Smiley in 2009 was

dismissed.

He's had several DUI arrests in the last 10 years. One of those may have resulted in a DUI conviction. I know at least one of them was dismissed. And one of them was reduced. We may have pled him to a single DUI probably about 2016.

There's nothing in his criminal history to suggest that he poses a danger to the community. There's nothing to suggest that he won't follow this Court's instructions and orders as far as contact with codefendants, contact with witnesses, curfews.

The only issue becomes the fact that they indicted his wife. I haven't previously dealt with this. I dealt with it once, but they were separated by the time they'd been indicted. But whatever the Court thinks is appropriate as far as that goes. I know Ms. Smiley was contacting me prior to find- -- being name a defendant. I know she loves her husband. I've known her many years. And I know he loves his wife. But, at the same time, this is unusual and whatever the Court thinks is appropriate.

Mr. Smiley's record of appearance, his lack of violence -- what I submit is some exaggeration in painting him as public enemy number one is just not justified. I look at this indictment, and it is a fairly run-of-the-mill drug indictment. The only thing unusual about it, really, are the allegations of money laundering by going to the casinos and

67

losing money.  In the aggregate, they show he lost about $18,000, as I recall.  Other than that, it is a fairly unremarkable charging document as these cases go.

And I would ask the Court -- the superior court granted him the lowest bond possible for the charge, which was a $2,500 bond, and that's why we are here today, asking the Court to -- you know, we waited until that order was entered. We'd ask the Court -- I don't believe that he needs a leg monitor, but he wore one, I believe, during the Western District of New York proceedings without any violations.  There was the -- he was never -- his bond was never revoked.  I do know there was a hearing at one point because one of the CNT agents from Savannah flew up there, unknown to his supervisors, and tried to get Mr. Smiley's bond revoked, back about 2011.

He can -- he will and is capable of complying with whatever direction and orders the Court sees fit to ensure that he leads a safe, low-key, and crime-free existence between now and his trial or disposition date.  And given the 7 months he's been in and the difficulty it will be for Mr. Smiley and myself to prepare this case if he is detained -- I haven't been able to go to the Chatham County Jail on a weekend in 2 and a half years, since December of 2020.  I believe I will have weekend access if he is detained at the McIntosh County Jail.

But the volume of evidence in this case, Your Honor, it is going to -- I mean, it's 2 hours of driving for one

68

visit.  It is going to be extremely difficult for both Mr. Smiley and myself to prepare this case if he is detained, and I'd ask the Court to consider the presumption rebutted and entertain Mr. Smiley's presumption of innocence and grant him bond in a reasonable amount with whatever conditions you think are necessary.

THE COURT:  Thank you, Mr. Crawford.

Ms. Mateo, as the Government has the burden, I'll give you the last word.

MS. MATEO:  Thank you, Your Honor.

May I approach?

THE COURT:  You may.

MS. MATEO:  Your Honor, I believe the last argument made by Defense Counsel, while I understand that there's travel involved, is not one of the factors that the Court should consider.  It doesn't go into the factors listed by the statute as to why someone should get bond or not, the convenience of a defense counsel.  I understand that they are entitled to preparing their defense; however, it is also something that is able to be done at the jail even with the drives.

The Government will say there is an argument made that there was no evidence past 2022.  That's when the investigated -- investigation really started between CNT and DEA.  That's why that date is so important.  But for him to allege there's no evidence, I would point him to read the

69

proffer that's in discovery of an individual saying he's been dealing with Mr. Smiley since 2017 at kilo and gram quantities of cocaine.  The Government would argue that's evidence to support.

Also, there was a discussion that the State entertained the lowest bond, so the Court should hear -- in speaking and having communications with the ADA, the state case is being dead docketed due to this federal indictment.  So any release order was due to that request by the State knowing that they would come before and have a federal indictment before them, so I don't think that argument holds much weight, that, really, a state judge made the determination.  The ADA did file a release -- excuse me -- a dead docket order -- or motion for the state case.

So, again, while I understand the arguments made, I believe, when looking at the factors under the statute, the nature and circumstances of the charged offense, the weight of the evidence, the history and characteristics, they weigh heavily in favor of detention in this case, Your Honor.

THE COURT:  All right.  Thank you, Ms. Mateo.

We've been going for the better part of an hour and a half.  I'm going to take a brief recess.  And when I return, I'll have my ruling with respect to this dispute.

We stand in recess.

COURT SECURITY OFFICER:  All rise.

70

(A recess was taken from 11:19 a.m. to 11:40 a.m.)

COURT SECURITY OFFICER:  All rise.  This honorable court is now back in session.  Please be seated and come to order.

THE COURT:  The issue of release versus detention is governed by the Bail Reform Act of 1984 as codified at Title 18 of the United States Code, Section 3142.  Subsection (g) of that code section establishes a set of factors which the Court is required to consider in analyzing the question of whether the defendant should be released or detained awaiting the trial of this case.

I'm going to go through each of the factors and discuss the evidence that's been received and how I weigh that evidence under each of the respective factors, and then we will apply that information to the Government's burden in reaching the conclusion.

The first factor which the Court is required to consider in Subsection (1) of Subparagraph (g) is the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a crime of federal terrorism, involves a minor victim, a controlled substance, explosive, or destructive device.

Obviously, by definition, with respect to the charged offense, it being the primary count, a controlled substances violation, it would appear that the nature and circumstances of

the offense charged is a factor which would militate in favor of detention simply by virtue of the charged offense.

The second factor which the Court is required to consider is the weight of the evidence against the person. Let me observe that any comments I make with regard to the weight of the available evidence in this case is in no means in any way in contravention of the presumption of innocence, which Mr. Smiley continues to enjoy in this case. He is, in fact, presumed to be innocent of all of the offenses with which he has been charged.

Nevertheless, the weight of the evidence available, as marshaled by the Government in this case, is not insubstantial. There is significant evidence to suggest that the offenses with which Mr. Smiley has been charged may, in fact, be true. There is evidence to suggest, in the form of testimony received today, that he had a leadership role or was alleged to have had a leadership role in this drug trafficking organization.

He has alleged -- he is alleged to have had direct involvement in moving substantial amounts of controlled substances through a distribution network, alleged to have directed and controlled the activities of members of that network, is alleged to have had direct involvement in the financial proceeds of the accused and alleged activity.

He is alleged to have been directly involved in the

72

laundering of those proceeds through different means, including the use of financial accounts and including through passing monies through a casino cage.  All of that is evidence which has suggested that the weight is somewhat strong.

That having been said and perhaps in recognition of the fact that the presumption of innocence still attaches, the weight of the evidence against the person is the least significant of the factors that the Court is charged to consider.  And as such, I will give it lesser weight and concern here, though it, too, would favor detention.

The third factor that the Court is required to consider is the history and characteristics of the person. And this factor has many subparts to it.  The Court is required to consider the person's character, his physical and mental condition, his family ties, his employment, his financial resources, his length of residence in the community, his community ties, his past conduct, any history relating to drug or alcohol abuse, his criminal history, his record concerning appearances at court proceedings, among other factors.

As is often the case, with respect to this third factor, there is evidence that cuts both ways here, some of it favorable to Mr. Smiley, some of it favorable to the position taken by the Government.

Let me first take up the factors which I think lean in Mr. Smiley's favor with respect to this.  The Court is

73

aware that Mr. Smiley has long, deep family ties in connection to this particular community.  He has a substantial length of time in this community.  He has community ties in the form of -- it was only briefly mentioned, but I understand he is connected to the ILA at the port and that that represents a long and deep connection, both professional and social, here in this community.  All of these are factors which would point to his character and his substance and would be reasons to consider his release in this case.

Additionally, in looking at the defendant's criminal history, as the Government has conceded and the Court agrees, this is by no means even close to the most substantial criminal history that the Court has ever seen in defendants who have had occasion to appear here.  In fact, I would even go so far to say that it is a comparatively mild criminal history compared to many of the defendants present.

It is important to note that even a number of the more significant named charges in the presentence investigation did not result in any disposition of conviction related to those charges.  By way of example, there is a charge of possession of a firearm by a convicted felon, but the conviction was for disorderly conduct, and the Court has to be mindful of that.

Similarly, the Government asked me to look at charges of willful obstruction and possession of marijuana, yet there's

no evidence that those actual charges went through to any conviction either, and so the Court has to give that its due weight.

Additionally, the Court is required to consider specifically a past history concerning appearances at court proceedings.  It is one of the named topics by name in Subtopic (3)(a).  The Court took into consideration and does give significant weight to the fact that Mr. Smiley had a prior prosecution in the United States District Court for the Western District of New York and, by all accounts, made his appearances, at a substantial distance, I would note -- that's probably some 8- or 900 miles from here -- in order for the defendant to be able to accomplish those things.

So all of those are factors that the Court can look to, and so those are the -- those are the positives.

There are also history and characteristic concerns, though, that run to the negative.  The Court is concerned that there is a prior charge of a probation violation indicating that Mr. Smiley may have difficulty at times complying with the terms or directions of a Court.

Additionally, although he was not revoked during the period of time he was on pretrial release in the Western District of New York, there are at least two instances in which he was alleged to have violated those conditions.  And although a judge may not -- although a judge may have determined that

revocation was not ultimately necessary, the violations alone, though, are a problem and suggest to the Court that there can be some concern, again, about Mr. Smiley's ability to comply with direction.

I will be frank in saying that I am compelled to afford very little weight, if any, to the Government's proffer concerning the allegation of a threat that Mr. Smiley is alleged to have made.  The Government, I think, honestly acknowledges that it's not a particularly weighty allegation.

But I have to add it's sort of gossamer thin, too, in that I'm not told to whom he made a threat.  I'm not told what he made the threat about.  I'm not told what the threat is.  And so that is a factor that I just -- I won't give much, if any, consideration to in this case.

I am also required to consider whether any of the current conduct occurred while the defendant was in any form of supervision.  I do not find any evidence to suggest that that is the case here.  That's usually only looked at as an exacerbating factor, not so much a mitigating one, but, nonetheless, it was not violated in any way.

The other thing about the person's character that I am required to comment on here today is that I do have significant concerns about the false identification that was found during the execution of the search warrant.

Mr. Crawford certainly, through one of his questions,

intimates a plausible quasi-benign reason for having multiple forms of identification. And I don't know this off the top of my head, but I suspect the possession of an altered or false Georgia driver's license may be a criminal act unto itself even if it's used for a quasi-benign purpose. And I don't know if hiding stuff from one's spouse can be called quasi-benign to begin with.

But nonetheless, there is also a nefarious potential purpose to the availability of that kind of identification. It points to a sneakiness. And the Court is always concerned about that as a character trait because it can bear directly on how responsive I think the defendant will be to any directive of the Court that he appear in the future.

The Court also has to comment upon some of the evidence received concerning what Officer Weir -- Agent Weir, rather, characterized as a somewhat sophisticated communication system, which points to, again, elements of potential sneakiness but also a high degree of intelligence in Mr. Smiley as well. And that, too, can be an opportunity for concern.

On balance, I would say that the history and characteristics of the person is a mixed bag, and I cannot say that it strongly favors either detention or release in this case when taken into consideration.

The fourth and final factor which the Court is required to consider is the nature and seriousness of the

danger to any person or the community that would be posed by the person's release.

In many respects, that fourth factor is sort of a microcosm of one of the two tests. It sort of points directly to the dangerousness question if the defendant were to be released.

I will say, having chosen to largely ignore and sideline the alleged threat, I do not see anything in this record before me that points to a direct history of any violent activity by Mr. Smiley in connection with this case. There is not a single charged offense that could be categorized as a crime of violence other than one offense -- one charge of possession of a firearm or a knife, on which he was acquitted. I don't see any evidence that he has possessed dangerous weapons routinely.

I fully understand that the Government's response to that is the notion that Mr. Smiley sits at the top of a pyramid of an organization and has taken actions to insulate himself from those things. That's an argument. How weighty it is is, I guess, for me to judge.

I am not persuaded that the conventional, sort of, violent type of dangerousness would apply to Mr. Smiley. But that's not the only form of dangerousness that the Court is required to consider. The Court is also required to consider whether Mr. Smiley at large could form some other form of

general dangerousness to the community, including dangerousness to the integrity of this prosecution.

There is some suggestion here that perhaps Mr. Smiley was trying to direct activity post-indictment. There is some suggestion that he has had, on the jail calls, continued coded communications. Those could be, in a sense, a form of dangerousness.

That fourth factor, on the whole, again, if it weighs in favor of detention at all, it's only very mildly. I'd say it, too, is closer to break even. So what we have are two factors that would weigh in favor of detention and two factors which, in the Court's opinion, at best, break even.

So I'm now required to run all of that analysis through the Government's burden in this case. And let me do that. As I said previously, the Government has essentially a dual or separate burden in this case. The Government has chosen to travel on both prongs of the basis upon which an individual can be detained, but the Government need only prevail on one of them for detention to attach.

So the first test that the Government -- and I'm so sorry. I want to add one other factor for consideration to the analysis before I go through the tests, and that is this.

I am also required to point out that although the presumption in favor of detention has been rebutted, it does not evaporate, and the Court is also continued to be compelled

to require to consider it even in its rebutted state.  So that is another factor that the Court must consider.

Having said that, let's look at the Government's burden with respect to the issue of dangerousness.  The Government's first burden is to demonstrate by clear and convincing evidence that there is no condition or combination of conditions of release which would reasonably assure the safety of any other person and the community.

That is a remarkably high burden of proof, and it is my view here that the Government has not carried its burden with respect to that first test.  I do believe that I could craft a set of conditions which would provide me with the reasonable assurance that Mr. Smiley would not be a danger to others or the community as a whole were I to release him on bond.

That then takes us to the second element of the Government's burden, and this is at a lower standard of proof. The Government's burden is to demonstrate by a preponderance of the evidence that there is no condition or combination of conditions of release which will reasonably assure the defendant's appearance as required.

In carefully considering certain pieces of the evidence here -- the availability of those fake IDs, the fact that the defendant was not cooperative with law enforcement when leaving the airplane in Atlanta, the fact that he has some

80

experience with sophisticated forms of communication and obfuscation -- I do have con- -- oh, and he is facing a significantly more weighty potential jail sentence in this case than he would have been in the one in the Western District of New York -- that he has incentive to flee, that he has the ability to flee.

I believe, at that lower standard, the Government is able to carry its burden, and so I do find that the Government was able to sustain by a preponderance of the evidence that the Court is without the ability to craft a set of conditions which would reasonably assure the appearance of Mr. Smiley at any future court date.

As such, the defendant's motion for bond in this case must be denied; the Government's motion for detention is granted; and I will enter an order of detention to that effect.

Ms. Mateo, is there anything else on behalf of the United States this morning in Mr. Smiley's case?

MS. MATEO:  No, Your Honor.  Thank you.

THE COURT:  All right.  Mr. Crawford, anything else on behalf of Mr. Smiley today?

MR. CRAWFORD:  No, Your Honor.  Thank you.

THE COURT:  All right.  There being no further business, then this court stands in recess.

COURT SECURITY OFFICER:  All rise.

(Proceedings concluded at 11:57 a.m.)

81

C E R T I F I C A T E

I, Victoria L. Root, Certified Court Reporter, in and for the United States District Court for the Southern District of Georgia, do hereby certify that the foregoing transcript of the proceedings held in the above-entitled matter was transcribed to the best of my ability from the Court's electronic recording system and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

WITNESS MY HAND AND SEAL this 28th day of April, 2024.

_____
VICTORIA L. ROOT, CCR B-1691
United States Court Reporter
Southern District of Georgia
Savannah Division

Post Office Box 312
Meldrim, Georgia  31318
(912) 650-4066